UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**JEFFREY L. WILLIAMS,**

**Appellant,**

**-v-**                                                           **6:07-CV-90**

**MARK W. SWIMELAR, in his official capacity
as Chapter 13 Trustee, and HAROLD MCGILL,**

**Appellees.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

RICHARD P. RUSWICK, ESQ.
401 E. State Street, Suite 306
Ithaca, New York 14850
Attorney for the Appellant

HAROLD McGILL
*Pro se*
11 Kentucky Ave.
Trumansburg, New York 14886

MARK W. SWIMELAR
CHAPTER 13 TRUSTEE
250 South Clinton Street, Suite 504
Syracuse, New York 13202

OFFICE OF THE U.S. TRUSTEE
10 Broad Street, Room 105
Utica, New York 13501

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

Jeffrey L. Williams ("Debtor") appeals under 28 USC § 158(a) from an Order of Chief

U.S. Bankruptcy Court Judge Stephen D. Gerling denying confirmation of his Amended Chapter

13 Plan.  Chief Judge Gerling based the denial on his conclusion that the Debtor failed to

establish that the plan complies with section 1325(a)(4) of the U.S. Bankruptcy Code ("Code"),

11 U.S.C. § 1325(a)(4).  For the reasons set forth below, the Court affirms the Order.

**FACTS**

**Background**

On Schedule B to his voluntary Chapter 13 petition, the Debtor listed his ownership

interest in Williams Insurance Agency ("Agency") as having zero market value.  The Debtor's

original plan proposed payments to the Chapter 13 Trustee in the amount of $531 per month for

60 months, totaling $31,860.  Harold W. McGill, an unsecured creditor, objected on the ground

that the Debtor had undervalued a number of assets.  The Trustee objected on the ground that the

Debtor was delinquent in payments to the Trustee.  Thereafter, the Debtor filed an Amended

Chapter 13 Plan proposing three monthly payments to the Trustee of $531, followed by 57

payments of $550, for a total of $33,350.60.  This would amount to payment to unsecured

creditors of 6.8% of their claims.

The Trustee filed a supplemental objection to the Amended Chapter 13 Plan.  Among the

objections was the following: "The Trustee requests information regarding the value of the

business since upon information and belief, the business has value of $90,000 due to the potential

sale of policies but schedule B lists a value of $0."  McGill again objected on various grounds,

including the valuation of the Agency at zero.  McGill noted that the Debtor's submissions listed

annual commission income of $150,000, and stated that "[t]he agency standard in determining the

market value of insurance agencies is at minimum one and a half times the gross commissions" or

at least $225,000.  In a second supplemental objection, the Trustee stated the plan "fails to satisfy

the liquidation test as set forth in 11 U.S.C. § 1325(a)(4) since it appears that unsecured creditors

-2-

would receive $100,000 from non-exempt equity in the business in a Chapter 7." In other words, the Trustee opined that the Agency had sufficient value that, if it were liquidated and the proceeds distributed to the unsecured creditors, they would receive more than they would receive under the Debtor's proposed Amended Chapter 13 Plan.

**Hearing**

Chief Judge Gerling held an evidentiary hearing on confirmation of the Amended Chapter 13 Plan. The parties agreed that the issue before the court was "what a Chapter 7 trustee could sell this agency for."

The Debtor testified that he had purchased two insurance agencies: one from McGill in 1994 or 1995, and the second from Melinda Stevenson in 1997. According to the Debtor, the purchase price of McGill's agency was not based on a multiple of gross receipts but rather on how much the Internal Revenue Service ("IRS") would accept to satisfy its payroll tax claims against McGill. The Debtor said he had wanted to purchase the business as a going concern, because if IRS had seized the McGill's book of business, the insurers would have cancelled the contracts, and there would be "nothing left." The Debtor did not remember what he paid for Stevenson's business, but said it was not based on gross receipts. He had made a down payment and agreed to pay the balance over time. Both McGill and Stevenson had signed agreements not to compete.

The Debtor explained that, based on its contract with an insurance company, an insurance agency receives a commission when it sells an insurance policy and an additional commission every time the customer renews the policy. On his schedule of assets, the Debtor listed $1,200 as accounts receivable, representing commissions earned but not yet received. About 90% of the

-3-

Agency's earnings resulted from renewals of policies.  The Debtor explained the personal effort he expended to obtain renewals from policy holders.  He stated that when he bought McGill's and Stevenson's businesses, he had to contact the insurers and obtain their authorization for him to sell their policies.  Essentially, what he bought in both cases was the book of business.  He did not pay cash for the businesses, but paid over time, because "no bank would loan money to buy an agency, to my knowledge."

The Debtor's gross proceeds in 2004, as reflected on 1099 forms supplied to him by the insurance companies which paid him commissions, were $162,214.  He could not explain why his tax return for 2004 listed gross receipts of only $118,899.

The Debtor stated his Agency was properly valued at zero because a Chapter 7 trustee would get no value from the book of business.  He explained as follows: "[I]f the agency is forced into liquidation, the companies will cancel the contract.  At that point, there is no agency to sell. The companies will take the policies back."  He further explained :

> [If they cancel the contracts, the companies will] just do the paperwork on them themselves.  They'll send out the bills, collect the money.  There's no place for the people to go and pay the premium.  There's no agent to represent the company in that case.  Therefore, there's nothing to sell. There's no value.

He stated that this opinion was based on his reading of the Agency's contracts with insurance companies.  He placed into evidence five such contracts: Drive Ins. Co., AIG, Ontario Ins., Kemper, and Allstate.  He acknowledged that at least one of the insurance companies knew he was in a Chapter 13 proceeding, but it did not cancel the contract.

The Trustee first called Jerome True, a local insurance agent experienced in buying and selling insurance agencies.  True testified that he had purchased eight insurance agencies.  He

-4-

was able to maintain the relationship with the insurance companies that had dealt with the selling agencies in all but one case.  He testified in some detail about the purchases.  In each case he purchased an ongoing business and obtained a covenant not to compete.  In each case he made a down payment of roughly 20% and paid the balance over time (from three to 15 years).  And in no case did he obtain bank financing based on the assets he was purchasing.  True stated that the value of an insurance business is generally calculated using a scale of between one and three times its annual earnings.  Asked hypothetically about purchasing the Agency, he opined that two times the annual earnings would be an appropriate price if it was an average agency.  He did not know whether the Agency would be an "average agency" if he purchased it from the Chapter 7 trustee.  He acknowledged that the absence of a covenant not to compete would reduce the price, as would a requirement that the purchase price be paid in cash.  He then observed that in this case the absence of a covenant not to compete would probably not greatly reduce the price, because insurers check the credit standings of agents and would not be likely to contract with the Debtor if he liquidated the business.  True concluded that twice the annual earnings would be an appropriate price for the Agency.

Melinda Stevenson testified that she sold her insurance business to the Debtor in December 1997 for $90,000, or approximately 1.25 times the gross earnings of the prior year.  It was an ongoing business.  The Debtor had made a down payment of $1,500 and paid an additional $13,500 at the closing, and the balance of $75,000 was to be paid over 10-15 years.  Stevenson had executed a covenant not to compete for three years.

Harold McGill testified that when he sold his insurance business to the Debtor in 1994 or 1995, the annual gross earnings had been approximately $90,000.  McGill said he was "under the

gun" to sell the business because he owed payroll taxes to IRS.  The sale price was 1.15 of the gross receipts, that is, $101,000, under an agreement whereby the Debtor had paid $2,500 to IRS as a deposit and had agreed to pay $500 per month to IRS and $376 per month to McGill for a period of 60 months.  It was an ongoing business and McGill had signed a covenant not to compete for five years.

At the close of the hearing, Chief Judge Gerling confirmed with counsel that the Debtor continued to take the position that the value of his ownership interest in the Agency was zero.

**Chief Judge Gerling's Decision**

In his thorough decision, Chief Judge Gerling first observed that, in seeking confirmation of a Chapter 13 plan, the burden is on the debtor to establish all requisites for confirmation, including the requirement that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under Chapter 7 of this title on such date."  11 U.S.C. § 1325(a)(4).  He referred to this as "the best interests of creditors test."  *See In re Hutchinson*, 354 B.R. 523, 531 (Bankr. D.Kan. 2006).  Thus, the question before the court was whether the Debtor had shown that the unsecured creditors would receive less under a liquidation by a hypothetical Chapter 7 trustee than they would under the Amended Chapter 13 Plan.

After summarizing the hearing testimony, Chief Judge Gerling wrote:

> True testified that in his opinion, the Agency was worth two times the annual gross earnings despite the fact that the Debtor was in bankruptcy. This would place the value of the Agency at a minimum of $244,956 based on the earnings of the Agency over the 12 months prepetition. Given the testimony of McGill and Stevenson that the Debtor had purchased their businesses for a total price of $191,000 approximately ten years ago, this

-6-

appears to be a reasonable figure.

Chief Judge Gerling addressed the issues raised by the Debtor, including the fact that the business could be run only by someone licensed to sell insurance. Chief Judge Gerling acknowledged that a Chapter 7 trustee was unlikely to be licensed to sell insurance and could not compel the Debtor to continue to service the accounts. The court noted, however, that under the Code a bankruptcy court may authorize a Chapter 7 trustee to operate a business for a limited period of time, and observed that there is "nothing to prevent a chapter 7 trustee from employing a licensed insurance agent to manage the accounts postpetition, with the consent of the companies, while the trustee proceeds to market the asset." He also noted that, although a Chapter 7 trustee could not compel the Debtor to enter into a covenant not to compete, True had testified that under the circumstances this would not affect the value of the Agency to any great degree.

The Debtor also relied on testimony from True, McGill and Stevenson that it is difficult to obtain financing from a bank to purchase an insurance agency, and that such sales typically require an initial down payment and then payments over time. Chief Judge Gerling observed that "Chapter 7 trustees oftentimes negotiate with other parties for payment over time, whether it is for the purchase of property of the estate or in settlement of the trustee's efforts to recover property of the estate." He added: "The Court does not view this as a deterrent in connection with a hypothetical sale of the Agency by a chapter 7 trustee."

With regard to the Debtor's point that some of the Agency's agreements with the insurance companies provide for their termination in the event of bankruptcy, Chief Judge Gerling reviewed the terms of each contract. He observed that some of the contracts provide the

companies with substantial discretion in deciding whether to terminate their relationship with the Agency.  He also noted that the Debtor's argument "is weakened somewhat ... when one considers that at least three of the agreements entered into evidence by the Debtor were executed with the Debtor postpetition when he was still in bankruptcy."

Chief Judge Gerling concluded:

> The Court recognizes that factors exist that would make it difficult, but certainly not impossible, for a chapter 7 trustee to sell the Agency for a reasonable price. However, this is not a chapter 7.  It is a chapter 13, and Code § 1325(a)(4) requires only that the Court consider the value of the Debtor's nonexempt assets in the context of a <u>hypothetical</u> chapter 7 case. As noted previously, it was the Debtor's burden to establish to the satisfaction of the Court that the Agency was only worth "0." Based on the evidence presented and using a multiplier of "one" in the context of this bankruptcy case, the Court is of the opinion that the Agency has a value of at least $122,478, based on the gross income for the 12 months prepetition, without taking into consideration the value of other assets such as the existing accounts receivable. (Emphasis in original.)

Based on this conclusion, he denied confirmation of the Debtor's Amended Chapter 13 Plan "based on his failure to establish that it complies with Code § 1325(a)(4)."

**DISCUSSION**

A reviewing court may set aside findings of fact made in a bankruptcy proceeding only if they are "clearly erroneous."  Fed. R. Bankr. P. 8013.  A bankruptcy court's conclusions of law are subject to *de novo* review.  *See In re Vebeliunas*, 332 F.3d 85, 90 (2d Cir. 2003).  Mixed questions of fact and law are subject to *de novo* review.  *See id.*

The Debtor argues that Chief Judge Gerling erred "by placing an impermissible burden on Mr. Williams by interpreting 11 U.S.C. 1325(a)(4) to require Mr. Williams to prove that it would be impossible for a chapter 7 [trustee] to run Mr. Williams' insurance agency in order to value the goodwill of that business as $0."  This argument, by seizing on a single phrase used by Chief

-8-

Judge Gerling,[1] misstates the holding of the court.  Chief Judge Gerling correctly interpreted and applied section 1325(a)(4) to require the Debtor to show (as the Debtor phrases it in his Memorandum of Law) that "the proposed Chapter 13 Plan [would] pay to unsecured creditors at least as much as they [would have] received if the debtor had filed a chapter 7 bankruptcy[.]" Nor did the court, as the Debtor contends, read the law as requiring the court to determine value "that results in the best possible advantage to the estate" or that "would be the best possible outcome for a chapter 7 trustee."  Chief Judge Gerling committed no error of law in this respect.

At the hearing, the Debtor based his entire section 1325(a)(4) argument on the contention that the value of the Agency was zero.[2]  The Debtor neither argued nor attempted to prove that, if the Agency had a value greater than zero, it had a value that was less than the $33,350.60 the Debtor proposed to pay under the Amended Chapter 13 Plan.

---

[1]

In the concluding paragraph of his decision, Chief Judge Gerling stated: "The Court recognizes that factors exist that would make it difficult, but certainly not impossible, for a chapter 7 trustee to sell the Agency for a reasonable price."

[2]

At the close of proof, the following colloquy took place between Chief Judge Gerling and the Debtor's counsel regarding the Debtor's representation in Schedule B that the value of the Agency was zero:

> THE COURT: Okay. All right. Then the proof is closed. Let me ask a question, Mr. Ruswick. This Schedule B to Mr. Williams' petition, Item Number 12 that much has been discussed..., that entry has not been amended, has it?
> MR. RUSWICK: No, Your Honor.
> THE COURT: It's zero it was and zero it is, is that it?
> MR. RUSWICK: That's correct.
> THE COURT: And it's the debtor's position that this agency has ... the ownership interest has a value of zero.
> MR. RUSWICK: That's correct, Your Honor.
> THE COURT: That's the debtor's position.
> MR. RUSWICK: Yes, Your Honor.
> THE COURT: All right.

In deciding the matter, therefore, Chief Judge Gerling first examined the evidence to determine whether it supported the Debtor's position that the Agency had no value.  The Debtor argues that the court should have credited the Debtor's testimony that, in the event of a Chapter 7 proceeding, the insurance companies would cancel the contracts with the Agency, whereupon there would be no business to sell and no value for the Chapter 7 trustee to realize.  Chief Judge Gerling considered the Debtor's testimony but found it did not establish that a Chapter 7 trustee could not realize a reasonable price on the Agency.  For example, in support of his contention that the insurance companies would terminate their contracts with the Agency in the event of a Chapter 7 bankruptcy, the Debtor offered only his own interpretation of the contracts.  Chief Judge Gerling reviewed the contracts in detail and noted that some of them provided the insurance companies with substantial discretion in deciding whether to terminate their relationship with the Agency.  He also observed that at least three of the agreements entered into evidence by the Debtor were executed after he had filed his Chapter 13 petition.  Also, Chief Judge Gerling noted that the contracts required that the agent be licensed to sell insurance, and reasoned that a Chapter 7 trustee could employ an insurance agent to operate the business for a limited period of time while the trustee marketed it.  He acknowledged that a Chapter 7 trustee could not compel a debtor to give a covenant not to compete, and concluded, based on True's testimony, that under the circumstances it would not greatly affect the value of the Agency.  Chief Judge Gerling further considered testimony by True, McGill and Stevenson that it is difficult to obtain bank financing to purchase an insurance agency and that such sales typically require an initial down payment and then payments over time.  The court observed that Chapter 7 trustees often negotiate with other parties for payment over time, and concluded that this was not "a

-10-

deterrent in connection with a hypothetical sale of the Agency by a chapter 7 trustee."  There is ample record evidence supporting Chief Judge Gerling's determination that the Debtor had not demonstrated that the Agency had no value.

Chief Judge Gerling then turned to consider the value of the Agency.  He held: "Based on the evidence presented and using a multiplier of 'one' in the context of this bankruptcy case, the Court is of the opinion that the Agency has a value of at least $122,478, based on the gross income for the 12 months prepetition, without taking into consideration the value of other assets such as the existing accounts receivable."  In this respect, Chief Judge Gerling relied on the testimony of True, who had purchased eight insurance agencies, and on the testimony of McGill and Stevenson, whose agencies the Debtor had purchased, regarding valuation of insurance agencies generally and the value of the Agency in particular.  The Debtor contends that this evidence is irrelevant because it concerns sales of agencies as going concerns.  He argues that if he filed for Chapter 7 bankruptcy, the insurance companies would terminate their contracts with the Agency and the business would close.  He raises the points that the Debtor would not likely give a covenant not to compete and that the purchase price of an insurance agency is typically paid over time.  Chief Judge Gerling took these factors into account in reaching the valuation.[3] And, as discussed above, the Debtor placed no evidence before Chief Judge Gerling to support a valuation at more than zero but less than the $33,350.60 the Debtor proposed to pay under the Amended Chapter 13 Plan.  The evidence fully supports Chief Judge Gerling's valuation.  There is no error in his valuation and thus no error in his conclusion that the Debtor failed to prove that, if the Agency were liquidated by a Chapter 7 trustee, the unsecured creditors would receive less

---

[3] Indeed, True opined that the Agency should be valued at twice its annual gross income.

-11-

than they would receive under the Amended Chapter 13 Plan.

On this appeal, the Debtor proposes a different method of valuation, one which he did not propose to Chief Judge Gerling and for which he did not adduce supporting evidence at the hearing.  Relying on *In re Schultz*, 250 BR 22, 35-37 (Bankr.E.D.N.Y. 2000), he proposes a valuation based on gross earnings less expenses.  There is no basis on this record to find that the accounting practice in *Schultz* is comparable to the Agency for valuation purposes; in fact, the Debtor's emphasis on the value of policy renewals would seem to suggest otherwise.  This point does not raise reversible error.

This Court has reviewed the other issues raised on the appeal and finds they lack merit.

## CONCLUSION

It is therefore

ORDERED that the Order of Chief U.S. Bankruptcy Court Judge Stephen D. Gerling is affirmed.

IT IS SO ORDERED.

April 18, 2008
Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge

-12-